UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CHERYL MATORY
TOMECA BARNES                                              PLAINTIFFS

VS.                          CIVIL ACTION NO. 3:16CV989TSL-RHW

HINDS COUNTY SHERIFF VICTOR MASON,
IN HIS INDIVIDUAL CAPACITY, AND
HINDS COUNTY, MISSISSIPPI                                  DEFENDANTS

MEMORANDUM OPINION AND ORDER

Defendants Hinds County Sheriff Victor Mason, in his individual capacity, and Hinds County, Mississippi, have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) as to pre-employment claims asserted by plaintiffs Cheryl Matory and Tomeca Barnes, and they have moved for summary judgment under Rule 56 as to the rest of plaintiffs' claims. Plaintiffs have responded in opposition to all three motions. The court, having considered the memoranda of authorities, together with attachments submitted by the parties, concludes that the motion for judgment on the pleadings as to claims based on pre-employment conduct should be granted and the motions for summary judgment as to both plaintiffs' remaining claims should be granted in part and denied in part, as set forth herein.

Facts

Beginning around 2014, Cheryl Matory, then a corporal and crime scene investigator with the City of Jackson Police Department (JPD), began working on Victor Mason's election

campaign for sheriff of Hinds County. Matory had known Mason since high school and agreed to help with his campaign because she thought he would make a good sheriff. At some point during the campaign, Mason offered to hire Matory as his undersheriff in the event he was elected; she agreed. The two often discussed additional potential employees, and at Mason's request, Matory began working to recruit certain individuals to work for Mason if he was elected. Mason was especially interested in hiring Tomeca Barnes and told Matory to ask Barnes, who was also a corporal with JPD, to help with his election campaign. Barnes agreed. Mason subsequently promised he would hire her as head of the Sheriff's Department's Internal Affairs Division (IAD) if he was elected.

Mason won the election for Hinds County sheriff in November 2015 and began finalizing his staff selections. Upon taking office on December 31, 2015, Mason, as promised, hired Matory as undersheriff and Barnes as head of the IAD. Matory asserts that throughout the campaign, Mason had tried to get her to help facilitate a sexual relationship between him and Barnes; she claims that he continued in this manner after he took office. According to Matory, after becoming sheriff, Mason regularly directed her to have Barnes come to his office. When on one occasion he threatened that she had better do so "or else," she asked what he meant by "or else". He responded, "[Y]ou think I'm playing. I'll show you." Matory asserts that after she told Mason

she was not going to arrange for him to have sex with Barnes,
Mason became angry and began to distance himself from her. Not
long thereafter, her demoted her from undersheriff to crime scene
investigator.

For her part, Barnes claims that prior to Mason's taking
office, she had several conversations with him, in person but
mostly via text, in which he made what she believed were sexual
overtures. She was able to subtly deflect his advances. She
contends that after he became sheriff and she was hired as head of
the IAD, she was often summoned to his office, ostensibly to
report to him on her department's work; but according to Barnes,
he never appeared interested in what she had to say and instead,
just stared at her. She states that he made her feel so
uncomfortable by the way he stared at her when she was summoned to
his office that she did not want to be left alone with him. She
asked that Matory be allowed to remain in his office during these
meetings, but Mason refused. Like Matory, Barnes alleges that
after she began to spurn Mason's unwanted advances toward her, she
was demoted from head of IAD to patrol officer.

According to plaintiffs, after Mason demoted Matory, he
replaced her as undersheriff with Pete Luke, a white male; and he
replaced Barnes with Keith Barnett, a black male. Several months
later – and apparently after Matory filed a charge of
discrimination with the EEOC and received a notice of right to sue

- Matory was terminated.  Barnes resigned in August 2017 while this action was pending.

## Plaintiffs' Causes of Action

Both plaintiffs have asserted claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983 for sexual harassment, claiming they suffered *quid pro quo* sexual harassment as well as sexual harassment based on hostile work environment.[1]  They have also sued under Title VII and § 1983 for gender discrimination.  In addition, Matory has purported to sue for race discrimination under Title VII, § 1983 and § 1981, and for retaliation under Title VII.  Both plaintiffs have also asserted state law claims for breach of contract/detrimental reliance.  Defendants have moved for judgment on the pleadings or for summary judgment on all of these claims.

## Judgment on the Pleadings: Pre-Employment Sexual Harassment

In their motion for judgment on the pleadings as to pre-employment claims, defendants point out that although Mason was

---

[1]     While some courts have noted some uncertainty as to whether a plaintiff may properly seek recovery against the same government defendant under both Title VII and § 1983 for the same alleged acts of discrimination, see, e.g., Wallace v. Desoto Cty. Sch. Dist., 302 F. Supp. 3d 779, 795 n.8 (N.D. Miss. 2018), most cases hold that a public employee may bring parallel causes of action against her government employer under Title VII (for Title VII violations) and under § 1983 for separate constitutional violations, even if both claims are premised on the same facts and conduct, see Crain v. Judson Indep. Sch. Dist., No. SA-16-CV-832 -XR, 2018 WL 1612857, at *4 (W.D. Tex. Apr. 3, 2018) (citing cases).

4

elected sheriff on November 2, 2015, he was not sworn in as
sheriff until December 31, 2015. They further note that many of
plaintiffs' allegations relate to alleged acts of sexual
harassment that occurred before Mason was even elected sheriff and
others that occurred while he was sheriff-elect. They contend
that, as a matter of law, neither Mason nor Hinds County may be
held liable, under Title VII or under § 1983, based on conduct
that predated Mason's tenure as sheriff.

Rule 12( c) Standard:

The standard for dismissal of a Rule 12(c) motion for
judgment on the pleadings is the same as that for dismissal for
failure to state a claim under Rule 12(b)(6). Johnson v. Johnson,
385 F.3d 503, 529 (5th Cir. 2004). In considering a Rule 12(b)(6)
motion to dismiss, the court, liberally construing the complaint
in the light most favorable to the plaintiff and taking as true
all facts pled therein, must determine whether the complaint
states a claim for relief that is plausible on its face. Ashcroft
v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d
868 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544,
570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A claim has
facial plausibility when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." Id. (quoting
Twombly, 550 U.S. at 556, 127 S. Ct. 1955).

Section 1983:  With respect to plaintiffs' § 1983 claims,
defendants maintain that Mason could not have been acting "under
color of law" until he actually assumed the office of Hinds County
Sheriff and that consequently, plaintiffs have no viable claim for
sexual harassment under § 1983 based on actions Mason is alleged
to have taken during his campaign or while sheriff-elect.

"The traditional definition of acting under color of state
law requires that the defendant in a § 1983 action have exercised
power possessed by virtue of state law and made possible only
because the wrongdoer is clothed with authority of state law."
West v. Atkins, 487 U.S. 42, 49, 108 S. Ct. 2250, 101 L. Ed. 2d 40
(1988) (citations and internal quotations omitted).  See also
Angel v. La Joya Indep. Sch. Dist., 717 F. App'x 372, 376 (5th
Cir. 2017) ("Misuse of power, possessed by virtue of state law and
made possible only because the wrongdoer is clothed with the
authority of state law, is action taken 'under color of state
law.'").  Obviously, during the time that he was a mere candidate
for office, Mason did not act under color of state law.  Moreover,
in the court's opinion, until he assumed office, Mason was not
"clothed with the authority of state law" and hence did not act
under color of state law.  Accordingly, defendants are entitled to
judgment on the pleadings as to plaintiffs' § 1983 claims to the
extent those claims are based on actions which pre-date December
31, 2015.  See Burrell v. City of Mattoon, 378 F.3d 642, 649 (7th

6

Cir. 2004) (concluding that mayor-elect and city council members, "though duly elected and sworn, were not yet in office because they had not been inaugurated as required by City ordinance" and therefore "were not yet 'state actors.'"); <u>Carlos v. Santos</u>, 123 F.3d 61, 65 (2d Cir. 1997) (holding that as defendant board member "had not yet even taken office" he "possessed no power by virtue of state law to misuse"); <u>Griffith v. Girdler</u>, No. CIV.A. 6: 07-442-DCR, 2009 WL 1956466, at *2 (E.D. Ky. July 8, 2009) (granting summary judgment on § 1983 claim on basis that the defendant was the mayor-elect, not mayor, at time of challenged action and thus was not acting under color of state law); <u>cf. Brady v. Fort Bend Cty.</u>, 145 F.3d 691, 701 (5th Cir. 1998) (rejecting argument that sheriff-elect did not exercise final policymaking authority when delivering letters to plaintiffs advising he did not intend to rehire them as deputies, because once he assumed office, "he reaffirmed his intention not to rehire the Plaintiffs and gave effect to that intent by not rehiring the Plaintiffs. *After [he] took office*, he was a state actor wielding the policymaking authority described above with respect to filling available deputy positions in the sheriff's department.") (emphasis added); <u>Arredondo v. Flores</u>, No. CIV. A. L-05-191, 2008 WL 4450311, at *14 (S.D. Tex. Sept. 30, 2008), <u>aff'd</u>, 347 F. App'x 62 (5th Cir. 2009) (defendant sheriff "became a state actor wielding policymaking authority after taking office. By acting

with such authority when he gave effect to his personnel decisions upon taking office, [he] ... acted under color of law.").

Title VII: Title VII protects employees from discrimination by their employers. "Determining whether a defendant is an 'employer' under Title VII ... involves a two-step process. First, the defendant must fall within the statutory definition. Second, there must be an employment relationship between the plaintiff and the defendant." Deal v. State Farm Cnty. Mut. Ins. Co., 5 F.3d 117, 118 n.2 (5th Cir. 1993). The Fifth Circuit has held that in Mississippi, the county sheriff, in his official capacity, and not the County or the sheriff in his individual capacity, is his deputies' employer under Title VII. See Oden v. Oktibbeha Cnty., 246 F.3d 458, 465 (5th Cir. 2001). Defendants contend that until Mason assumed office as sheriff on December 31, 2015, he could not have been plaintiff's employer for Title VII purposes, and that he could have had no employment relationship with plaintiffs until they became employed by the Sheriff's Department in January 2016.

To the extent that plaintiffs attempt to assert a Title VII hostile work environment sexual harassment claim based on alleged harassment by Mason prior to his assuming the office of sheriff, their claim fails as a matter of law. There cannot have been a hostile work environment at a time when there was no employment relationship. However, citing Simmons v. Lyon, 746 F.2d 265, 270

8

(5th Cir. 1984), plaintiffs argue that they have stated a viable *quid pro quo* sexual harassment claim based on Mason's pre-employment actions. The court is unpersuaded. In <u>Simmons</u>, two plaintiffs (a mother and daughter) who had been employees of a defeated sheriff, sued the successor sheriff, Lyons, for gender discrimination under Title VII alleging that he failed to re-appoint them when his term commenced because one of them, the daughter, had rejected his sexual advances. The court concluded that the claim was actionable, notwithstanding that the alleged act of sexual harassment occurred before Lyons took office, because "the discriminatory employment violation based on sex or gender occurred when [he] failed to re-hire [the daughter] on or after [the date he took office] – allegedly because of her rejection of his sexual advances –, at which time Lyons was an employer within the definition of Title VII. 42 U.S.C. § 2000e(b)." <u>Id</u>. The court further observed that "Title VII's prohibitions against discriminatory employment practices do not apply only to an existing employment relationship but also to prospective employment relationships *that do not eventuate* because of the discriminatory conduct—as where an applicant for employment is denied employment for a prohibited discriminatory reason." <u>Id</u>. (emphasis added).

While there are similarities between the facts of this case and of <u>Simmons</u>, <u>Simmons</u> is materially distinguishable from the

present case.  Similar to Lyons, Mason allegedly made sexual

advances to Barnes before he took office; and he allegedly at

least intimated to Matory that she would not be hired if she

failed to facilitate a sexual relationship between him and Barnes.

However, in contrast to <u>Simmons</u>, plaintiffs herein do not contend

that Mason failed to hire them because of any discriminatory

conduct.  On the contrary, he hired both of them.  The challenged

tangible employment action, i.e., plaintiffs' demotions, occurred

well after they became employed, when Matory thereafter refused to

help him have a sexual relationship with Barnes and when Barnes

began to distance herself from him.  In short, in this case,

unlike <u>Simmons</u>, plaintiffs' *quid pro quo* claims are not based on a

failure to hire and are necessarily based on post-employment, not

pre-employment conduct by Sheriff Mason.  Defendants' motion for

judgment on the pleadings will therefore be granted.

### Summary Judgment Standard

Defendants have moved for summary judgment on plaintiffs'

remaining claims.  Rule 56(a) provides that "[t]he court shall

grant summary judgment if the movant shows that there is no

dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a

summary judgment motion, the moving party must initially

"demonstrate the absence of a genuine issue of material fact."

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 91

L. Ed. 2d 265 (1986).  Once the moving party meets its burden, the burden shifts to the nonmovant, "who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists" and that summary judgment should not be granted.  <u>Norwegian Bulk Transport A/S v. Int'l Marine Terminals Partnership</u>, 520 F.3d 409, 412 (5th Cir. 2008).  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice.  <u>Celotex</u>, 477 U.S. at 323.  Instead, "the nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."  <u>Morris v. Covan World Wide Moving, Inc.</u>, 144 F.3d 377, 380 (5th Cir. 1998).

In considering a motion for summary judgment, all reasonable inferences to be drawn from both the evidence and undisputed facts are to be viewed in the light most favorable to the nonmoving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper.  <u>Kelley v. Price-Macemon, Inc.</u>, 992 F.2d 1408, 1413 (5th Cir. 1993) (citing <u>Matsushita</u>, 106 S. Ct. at 1351).  On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper."  <u>Id.</u>

Section 1981

Barnes has purported to sue Hinds County and Sheriff Mason, in his individual and official capacities, for race discrimination in violation of § 1981.  To the extent she has pled § 1981 as an independent cause of action against defendants and not under the remedial provisions of § 1983, her claim based on § 1981 must be dismissed.  See Montgomery-Smith v. Louisiana Dep't of Health & Hosps., 299 F. Supp. 3d 790, 805 (E.D. La. 2018) (citing Felton v. Polles, 315 F.3d 470, 482 (5th Cir. 2002), abrogation on other grounds recognized by Jackson v. Honeywell Intern., Inc., 601 Fed. App'x 280 (5th Cir. 2015), and explaining that "when a state employee seeks to hold an individual fellow state employee liable in damages for violation of § 1981 rights, such claim must also be pursued under the remedial provisions of § 1983.").

Title VII/Section 1983

Title VII prohibits an employer from "discharg[ing] an individual, or otherwise discriminat[ing] against any individual ... because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Section 1983 imposes liability on those who, under color of state law, "subject[] ... any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...."  42 U.S.C. § 1983.  Sex discrimination and sexual harassment in public employment, and race discrimination in public

employment, violate the Equal Protection Clause of the Fourteenth

Amendment.  See Southard v. Tex. Bd. of Crim. Justice, 114 F.3d

539, 550 (5th Cir. 1997) (sex discrimination/harassment); Police

Ass'n of New Orleans Through Cannatella v. City of New Orleans,

100 F.3d 1159, 1167 (5th Cir. 1996) (race discrimination).  Claims

alleging such violations are thus actionable under § 1983.

A plaintiff who alleges the same conduct for both Title VII

and § 1983 claims may seek redress under both statutes, as long as

the "conduct violates both Title VII and a separate constitutional

or statutory right."  Evans v. City of Houston, 246 F.3d 344, 356

(5th Cir. 2001).  See also Lauderdale v. Texas Dep't of Criminal

Justice, Institutional Div., 512 F.3d 157, 166 (5th Cir. 2007)

(citing Cervantez v. Bexar County Civil Serv. Comm'n, 99 F.3d 730,

734 (5th Cir. 1996) (§ 1983 and Title VII are "parallel causes of

action").  In a Title VII action, the only proper defendant is the

plaintiffs' "employer", which in this case, was Sheriff Mason, in

his official capacity.  See Oden, 246 F.3d at 465 (holding that in

Mississippi, proper Title VII defendant was the sheriff in his

official capacity, rather than the county or the sheriff

individually,  since by statute, Miss. Code Ann. § 19-25-19,

sheriff was "solely responsible for hiring, promoting, and

establishing the deputies' wages" and "was the elected official

who made all decisions concerning promotions within the Sheriff's

Department").  However, while neither Hinds County nor Sheriff

Mason, in his individual capacity, was plaintiffs' employer for Title VII purposes, both are subject to potential liability under § 1983 for the alleged discrimination.

When a plaintiff brings claims under Title VII and § 1983 premised on the same set of facts, the court evaluates both claims under the standard governing Title VII actions. See Irby v. Sullivan, 737 F.2d 1418, 1431 (5th Cir. 1984) ("[W]hen section 1983 is used as a parallel remedy with Title VII in a racial discrimination suit the elements of a cause of action are the same under both statutes."); see also Lauderdale, 512 F.3d at 166 (inquiry is essentially the same for actions brought under Section 1983 and Title VII) (citations omitted).

To maintain a claim for sexual harassment under Title VII or § 1983, a plaintiff must demonstrate: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment complained of was based upon sex; and (4) that the harassment complained of affected a term, condition, or privilege of employment. Watts v. Kroger, 170 F.3d 505, 509 (5th Cir. 1999). To prove the harassment affected a term, condition, or privilege of employment, she must prove that it either resulted in a tangible employment action (*quid pro quo*) or was severe or pervasive (hostile work environment). Bustillos v. Miss. Valley State Univ., No. 4:12-CV-007-SA-JMV, 2013 WL 123730, at *2 (N.D. Miss. Jan. 9, 2013) (citing Burlington Indus.,

Inc. v. Ellreth, 524 U.S. 742, 753-54, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)).  Plaintiffs herein allege both *quid pro quo* and hostile work environment theories of sexual harassment, charging that

> Mason's repeated unwanted and unwelcomed demands for Matory to arrange sexual liaisons with Barnes had the effect of unreasonably interfering with the Plaintiffs' work performance and creating an intimidating, hostile and offensive working environment for both women.

> Mason and Hinds County, Mississippi conditioned the terms and conditions of [plaintiffs'] continued employment on Matory's willingness to arrange sexual liaisons between Barnes and Mason and Barnes's willingness to have unwanted sex with Mason.

Hostile Work Environment:  Harassing conduct affects a "term, condition, or privilege of employment" so as to create a hostile work environment, "only if it is either 'severe' or 'pervasive.'" Higgins v. Lufkin Indus., Inc., 633 F. App'x 229, 235 (5th Cir. 2015) (citations omitted).  "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile [or] abusive, and subjectively offensive, meaning that the victim perceived it to be so."  Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 874 (5th Cir. 1999).  When determining whether an environment is hostile or abusive, the court must look at the totality of the circumstances, taking into account such factors as "the frequency of the conduct, its severity, the degree to which the conduct is physically threatening or humiliating, and the degree to which the

15

conduct unreasonably interferes with an employee's work performance." Barnett v. Boeing Co., 306 F. App'x 875, 879 (5th Cir. 2009) (quotation marks and citations omitted).

Here, as explained *supra* pp. 7-10, the court may consider only evidence of Mason's alleged harassing conduct that occurred from the time he took office on December 31, 2015, in determining whether plaintiffs have presented sufficient evidence to create a genuine issue of material fact on their respective hostile work environment claims. Having done so, the court concludes that Matory has presented sufficient evidence to withstand summary judgment on this claim, but Barnes has not.

Barnes testified that her duties as head of the Internal Affairs Division (IAD) with the Sheriff's Department included meeting with Sheriff Mason, usually two to three times a week, to brief him on the activities and findings of the IAD. Barnes testified that when she first began meeting with Sheriff Mason to give him briefings after becoming employed by the Sheriff's Department, he would greet her by hugging her. This "didn't feel right," she testified, so she told him she was going to "forgo the hugs" and "just shake his hand," after which there were no more hugs. Barnes further testified that when she met with Sheriff Mason for these briefings, she noticed he was not interested in the matter on which she was briefing him, and instead, he would just stare at her "in a seductive manner," as though he was

16

"undressing [her] with his eyes." The way he looked at her made her feel uneasy to such an extent that she did not want to meet with him alone and asked Matory to remain in the room for the meetings; Mason, though, generally would not allow Matory to stay.

As additional evidence of alleged sexual harassment, Barnes recounted an exchange of text messages with Sheriff Mason over several days during late January 2016, while she was away on drill duty with the National Guard. In response to a text inquiry by Sheriff Mason as to her whereabouts, Barnes texted a picture of herself in her military uniform. The next day, Mason texted her a picture of another person in a military uniform that he said he thought looked like her, and he asked her to send him a "selfie." When she responded that she had sent one the day before, he responded, "That was yesterday." Two days later, Mason again texted Barnes the picture of the other person in military uniform; and the following day, he texted to her the picture she had originally sent to him and asked, "[W]hen did you take this picture?" She responded by sending him two more pictures of herself in full military gear, to which he replied, "Nice!!! Oh wow look at you. Awesome. Anymore?" She replied, "No. I'm at the gym." Lastly, Barnes testified that following her demotion in July 2017, Sheriff Mason came to a training session and while heading to the front of the room, he stopped next to her and touched or "caressed" her shoulder.

In summary, Mason's behavior, as described by Barnes, consisted of his leering at her during meetings, hugging her on occasion until she asked him to stop, engaging in what could be interpreted as flirtatious texting, and caressing her shoulder on one occasion. Such behavior could not reasonably be found to have been sufficiently severe or pervasive to alter Barnes' conditions of employment and therefore cannot establish a hostile work environment claim.

For her part, Matory testified that once she became employed by the Sheriff's Department, Mason constantly asked her about Barnes, telling her to call or text Barnes to come to his office and trying to get her "to make sexual arrangements" with Barnes for him. According to Matory, this sort of thing happened not just every once in a while, but all the time, every day, every time she saw him. Matory testified that in addition to Sheriff Mason's constantly insisting that she help arrange a sexual encounter between him and Barnes, Mason told her on one occasion, "Well, if you don't get Tomeca to do it, then what about you?" He also ordered her to kiss an employee (nicknamed "Lips"); asked her several times what she would do if she came into his office and it "smelled like ass"; and made numerous comments to the effect of "everybody loves dick" (which he claims referred to an employee named Richard Brown).

In support of their motion as to Matory, defendants argue, *inter alia*, that there is no precedent to support a claim for a hostile work environment based on allegations that a plaintiff was asked by an employer about the employer having sex with a third party. However, in <u>Davenport v. Edward D. Jones & Co., L.P.</u>, albeit in the context of reviewing a *quid pro quo* claim, the Fifth Circuit observed that "a plaintiff simply must show that the tangible employment action she suffered resulted from her 'acceptance or rejection of h[er] supervisor's alleged *sexual harassment*.'" 891 F.3d 162, 171 (5th Cir. 2018) (quoting <u>Alaniz v. Zamora-Quezada</u>, 591 F.3d 761, 772 (5th Cir. 2009) (allowing *quid pro quo* claim to proceed where the plaintiff alleged her supervisor conditioned bonuses upon her agreeing to date a client). Significantly, the court defined "sexual harassment" as "[u]nwelcome[] sexual advances, *requests for sexual favors, and other verbal or physical conduct of a sexual nature*." <u>Id</u>. (quoting <u>Simmons</u>, 746 F.3d at 270). In the court's opinion, under this definition, Mason's insistence that Matory arrange a sexual encounter between him and Barnes could reasonably be found to qualify as sexual harassment. <u>Cf</u>. <u>Sirois v. East West Partners, Inc.</u>, 285 F. Supp. 3d 1152, 1162-63 (D. Hawaii 2018) (plaintiff's allegation that her supervisor "direct[ed] her to plan and attend events intended to have a sexually charged environment that included 'pimping out' [supervisor's] wife to" a client was

"directly related to the hostile work environment that [such supervisor] allegedly created.").

Defendants argue, moreover, that the alleged conduct of Sheriff Mason subsequent to his taking office as sheriff was not sufficiently severe or pervasive to demonstrate a hostile work environment. The court does agree that the conduct identified, considered singly or in combination, does not qualify as severe. However, "to survive summary judgment on a hostile environment claim, a plaintiff need only show that the harasser's conduct was 'severe or pervasive.' [She] does not have to prove both." La Day v. Catalyst Tech., Inc., 302 F.3d 474, 482-83 (5th Cir. 2002) (citation omitted). In the court's opinion, Matory's testimony describing Sheriff Mason's unrelenting insistence that she arrange a sexual encounter with Barnes and veiled threats of what would happen if she did not comply is sufficient to create a genuine issue of material fact on this question.[2]

Quid Pro Quo: Each of the plaintiffs has testified that she was demoted for her rejection of Mason's sexual advances or refusal to provide sexual favors. To succeed on a claim of *quid pro quo* sexual harassment, a plaintiff must show that she suffered a "tangible employment action" that "resulted from [her] acceptance or rejection of [her] supervisor's alleged sexual

---

[2]     The issue of pretext is addressed *infra* pp. 23-25.

harassment." Casiano, 213 F.3d at 283-84.  Both plaintiffs have presented evidence they were demoted, Matory from undersheriff to crime scene investigator and Barnes from head of IAD to patrol officer.  In the court's opinion, both have also presented sufficient evidence of causation to withstand summary judgment on this claim.

In this regard, Matory has testified that although Sheriff Mason never explicitly said that her continued employment as undersheriff depended on her arranging a sexual encounter between him and Barnes, the threat was clearly implied.  For example, on one of the many occasions he told her to get Barnes to come to his office, he told her, "Well, if you don't [get Barnes in here], you know, well, [you have your] job to consider."  Another time, he told her to get Barnes to his office "or else."  When she asked what he meant by that, he told her, "You think I'm playing.  I'll show you."

Moreover, Matory maintains that Mason followed through with his veiled threats when he demoted her in July 2016.  In support, Matory testified that when she began telling Mason, sometime in April or May, that she was not going to help arrange for him to have sex with Barnes, he became angry and began to distance himself from her; he would not answer her calls and did not respond to her texts.  She stated that the week before she was demoted, after he persisted in asking her about Barnes, she became

agitated and again told him she was not going to help him with Barnes. She could tell at the time that he was upset and angry. The following week, she received notice that she had been demoted.

Defendants argue that since Matory has conceded that Sheriff Mason never explicitly told her that her employment was contingent on her getting Barnes to have sex with him, she has no cognizable claim. Mason's alleged comments, they seem to suggest, were too vague and unspecific to be construed as implying a threat to her employment. The court is not persuaded. A reasonable jury could well find an implied threat in his comments,[3] and could also find that she was demoted because of her refusal to help provide the sexual favors he requested.

The court further concludes that defendants have not demonstrated entitlement to summary judgment on Barnes' *quid pro quo* sexual harassment claim. In contrast to Matory, there is no evidence that Sheriff Mason ever explicitly propositioned Barnes or requested sexual favors of her. However, "there is no requirement of an explicit sexual proposition to support a *quid*

---

[3] While Mason's pre-employment actions do not provide a basis for a cause of action or for recovery on any claim in this cause, that does not mean that his actions and statements prior to being sworn in are irrelevant. On the contrary, his alleged pre-employment threats to Matory, for example, would be relevant in discerning the meaning of his alleged "or else" and "I'll show you" comments to Matory.

*pro quo* claim and even conduct that is merely 'inappropriate,' considered cumulatively, may suffice to demonstrate a sexual advance on which such a claim can be based." <u>Coe v. N. Pipe Prod., Inc.</u>, 589 F. Supp. 2d 1055, 1084 (N.D. Iowa 2008). Here, according to Barnes' testimony, she perceived Mason's actions toward her – the leering, hugging, and flirtatious texting – to have sexual undertones which made her uncomfortable. Given the evidence of record, it cannot be said as a matter of law that her belief was unreasonable. That is to say, there is evidence from which a reasonable juror might conclude that Mason was making sexual advances toward her. Furthermore, Barnes has testified that soon after she began to distance herself from Mason and after Matory made clear that she would not facilitate a sexual encounter between Mason and Barnes, Barnes was demoted. Accordingly, she has presented sufficient evidence to support the elements of her claim for *quid pro quo* sexual harassment.

<u>Pretext</u>: Defendants argue that whereas they have articulated legitimate nondiscriminatory reasons for demoting and terminating Matory and for demoting Barnes, plaintiffs have failed to come forward with evidence to show that these reasons were pretext for discrimination. In this regard, defendants claim that Barnes was demoted because "she failed to follow the appropriate chain of command when required to do so" and "had great difficulty getting

23

along with co-workers." Barnes has offered sworn testimony denying both assertions.

Defendants state that Matory was demoted because she "quit fulfilling her duties as undersheriff. In particular, [she] had too much difficulty making decisions and carrying out her supervisory obligations. In addition, Matory had difficulty getting along with co-workers." However, Matory, like Barnes, has testified by deposition that there is no merit to these charges. Plaintiffs' sworn deposition testimony is competent evidence to create a genuine issue of material fact on the issue of pretext.

Matory alleges that in addition to being demoted, she was ultimately terminated because of her refusal to arrange sexual encounters between Mason and Barnes. Defendants have offered a couple of different explanations for Matory's termination. In sworn responses to interrogatories, they asserted that Matory was terminated "for failing to fulfill her obligations as crime scene investigator. In particular, [she] failed to respond to calls as crime scene investigator on more than one occasion. Furthermore, [she] had too much difficulty making decisions. In addition, [she] had difficulty getting along with co-workers." However, Sheriff Mason testified that Matory was terminated based on her inappropriate/unprofessional conduct after being placed on administrative leave for failing to respond to calls as a crime scene investigator. According to Sheriff Mason, after being

placed on leave, Matory attempted to depart the sheriff's office in a patrol car. When told she would need to leave the vehicle, she got out of the vehicle, left it parked in the middle of the street and walked away with the keys in her pocket. As the circumstances of Matory's departure on that occasion are not clear from the record, the court will deny the motion for summary judgment as to Matory's *quid pro quo* claim based on her termination.[4]

Gender Discrimination/Race Discrimination:

In addition to alleging gender discrimination in the form of sexual harassment, Matory also alleges that she was subjected to disparate treatment based on her female gender and on the basis of

---

[4]     Sheriff Mason has asserted that plaintiffs' claims against him in his individual capacity are barred by his qualified immunity. However, if he engaged in intentional sexual harassment, an issue as to which the court finds there is a genuine issue of material fact, then he has no qualified immunity. See Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div., 512 F.3d 157, 166 (5th Cir. 2007) ("[Q]ualified immunity can never offer protection for sexual harassment because, if it is actionable at all, the harassment is by definition objectively offensive and unreasonable, and qualified immunity protects only the 'objectively reasonable[.]'") (citation omitted).
    Hinds County and Sheriff Mason in his official capacity have argued that they cannot be liable under § 1983 since plaintiffs have failed to identify an official policy. However, Sheriff Mason is the final policymaker and therefore, his actions constitute official policy. See Brady v. Fort Bend Cty., 145 F.3d 691, 698 (5th Cir. 1998) (explaining that "a single action by a municipal official possessing final policymaking authority regarding the action in question constitutes the official policy of the municipality"); Patton v. Wayne Cty., Miss., No. 2:16-CV-186-KS-MTP, 2018 WL 355150, at *6 (S.D. Miss. Jan. 10, 2018) (sheriffs are final policymakers in Mississippi with full authority over employment decisions in their department).

her race.  To succeed on a claim of disparate treatment, a
plaintiff must prove that (1) she was a member of a protected
class; (2) she was qualified for the position; (3) she suffered an
adverse employment action; and (4) she was replaced by someone
outside her protected class or was treated less favorably than a
similarly situated person outside the protected class in nearly
identical circumstances.  Okoye v. Univ. of Tex. Houston Health
Science Ctr., 245 F.3d 507, 512-13 (5th Cir. 2001).

As the basis for her race/gender discrimination claim, Matory
alleges that upon her demotion from undersheriff to crime scene
investigator, she was replaced by a white male, Pete Luke.
Defendants suggest that Matory cannot prevail on this claim in
view of her deposition testimony that Pete Luke was never actually
designated as "undersheriff" afer her demotion.  Matory did so
testify.  However, she also testified that while Luke may not have
officially been given the title of "undersheriff," he was
effectively the undersheriff as he was elevated from sergeant to
major and assumed all the job duties she had performed as
undersheriff.  In the court's opinion, this testimony creates a
genuine issue of material fact as to whether she was replaced as
undersheriff by Pete Luke.

Defendants additionally argue that Matory has failed to
present sufficient evidence of pretext to withstand summary

judgment on this claim.  The court rejects this argument for the reasons set forth *supra* pp. 23-25.

Retaliation: Title VII

Plaintiffs allege that in retaliation for their unwillingness to fulfill Mason's sexual desires, he "refused to ensure that they were paid the salary he promised while recruiting them", then demoted them and later terminated Matory.[5]  Matory alleges, further, that she was terminated in retaliation for filing a charge of discrimination with the EEOC.[6]

"The burden-shifting structure applicable to Title VII discrimination cases, as set forth in [McDonnell Douglas], is applicable to Title VII unlawful retaliation cases."  Haynes v. Pennzoil Co., 207 F.3d 296, 299 (5th Cir. 2000).  To establish a

---

[5]     In her response memorandum, Barnes asserts that she was constructively discharged in August 2017.  She goes on to argue that her constructive discharge was a tangible employment action supporting her *quid pro quo* claim, and she also suggests it was a materially adverse employment action supporting a claim for retaliation for rejecting Mason's sexual advances and for filing an EEOC charge.  However, there is nothing in the operative complaint even hinting that Barnes was constructively discharged. In fact, at the time the original complaint and amended complaints were filed, Barnes was still employed by the Sheriff's Department and in the wake of her resignation, she has not moved to amend her complaint to include a claim based on an alleged constructive discharge.

[6]     Barnes filed a complaint of discrimination with the EEOC in July 2016, following her demotion.  Although she intimates in her response memorandum that she was retaliated against as a result of filing that charge of discrimination, she has made no allegation to that effect in her complaint.

*prima facie* case of Title VII retaliation, "a plaintiff must show that: (1) [s]he engaged in activity protected by Title VII; (2) [s]he was subjected to an adverse employment action; and, (3) a causal link existed between the protected activity and the adverse employment action." <u>Davis v. Dallas Area Rapid Transit</u>, 383 F.3d 309, 319 (5th Cir. 2004) (citing <u>Banks v. E. Baton Rouge Parish Sch. Bd.</u>, 320 F.3d 570, 575 (5th Cir. 2003)).

Citing <u>Moore v. Bolivar County, Mississippi</u>, No. 4:15-CV-145-DMB-JMV, 2017 WL 5973039, at *10 (N.D. Miss. Dec. 1, 2017), plaintiffs argue that an employee's rejection of her supervisor's alleged sexual advances is protected activity under Title VII. In at least two cases, however, the Fifth Circuit has affirmed summary judgment on Title VII retaliation claims where the only arguable protected activity was an employee's rejection of her supervisor's advances. <u>See</u> <u>LeMaire v. Louisiana Dep't of Transp. & Dev.</u>, 480 F.3d 383, 389 (5th Cir. 2007); <u>Frank v. Harris County</u>, 118 Fed. Appx. 799, 804 (5th Cir. 2004).

Filing an EEOC charge is clearly protected activity. <u>See</u> <u>Vadie v. Miss. State Univ.</u>, 218 F.2d 365, 379 (5th Cir. 2000). However, Matory's claim that she was terminated in retaliation for filing an EEOC charge fails for another reason. Matory relies exclusively on temporal proximity to establish a causal link between the filing of her EEOC charge and her termination. That is, she relies solely on the fact that she was terminated five

months after filing her EEOC charge.  The Fifth Circuit has held that a period of five months "is not the kind of 'very close' temporal proximity that has been recognized as providing sufficient evidence of causality, in and of itself, to establish a *prima facie* case of retaliation."  Everett v. Cent. Miss., Inc. Head Start Program, 444 F. App'x 38, 47 (5th Cir. 2011).  The motion for summary judgment will be granted as to both plaintiffs' claims for retaliation under Title VII.

Detrimental Reliance

Plaintiffs assert a state law claim for detrimental reliance based on allegations that Mason, acting with apparent authority, promised them they would be paid certain salaries upon becoming employed by the Hinds County Sheriff's Department; that he knew or should have known they would rely to their detriment on the salaries he promised; and yet he failed to honor that promise once he took office.  Defendants have offered various reasons plaintiffs' claims cannot succeed, each of which, in the court's opinion, is mistaken or misplaced in one way or another.  With reference to Matory, defendants first argue that her claim fails because Mason's promise to hire her as undersheriff was made prior to his being elected sheriff.  Her claim, though, is not based on Mason's failure to hire her as his undersheriff but rather his failure to pay her the salary he allegedly promised her. Defendants next argue that the proof shows that Matory was, in

fact, paid the salary she was promised.  The evidence regarding what she was promised and what she was actually paid as undersheriff is murky.  Defendants purport to have adduced payroll records which establish her actual salary; but no such records have been presented.  Moreover, in her deposition, when presented with payroll records by defendants, Matory disputed their accuracy and insisted she was not paid what she was promised (although she was unclear about the amount she was promised and the amount she was paid).  In light of this evidence, the court is unable to conclude that summary judgment is warranted.

Defendants argue that Barnes' detrimental reliance claim fails as a matter of law since Barnes admitted that Mason's alleged promise regarding the salary she would be paid was made prior to his being elected sheriff.  That is not the case.  She plainly testified that the promise was made after Mason was elected sheriff.  Lastly, defendants declare that both plaintiffs' detrimental reliance claims are barred by the Mississippi Tort Claims Act (MTCA), Miss. Code Ann. § 11-46-1 *et seq.*.  They fail, however, to explain why the MTCA would bar these claims. Defendants correctly point out that the Mississippi Legislature declared in § 11-46-3(1) its intent to provide immunity for political subdivisions "from suit at law or in equity on account of any wrongful or tortious act or omission or breach of implied term or condition of any warranty or contract."  "However, Miss.

Code Ann. § 11–46–5 provide[s] a limited waiver of the immunity granted under Section 11–46–3....” City of Jackson v. Estate of Stewart ex rel. Womack, 908 So. 2d 703, 711 (Miss. 2005). That limited waiver of immunity has been found to apply to claims for detrimental reliance/promissory estoppel. See Weible v. Univ. of S. Miss., 89 So. 3d 51, 60 (Miss. Ct. App. 2011) (noting that the plaintiff's arguments concerned issues regarding implied contracts, such as promissory and equitable estoppel [and] detrimental reliance,” and observing that “[t]he Mississippi Supreme Court has interpreted ... section 11–46–5 (Rev. 2002) of the MTCA to provide a limited waiver of immunity for breach of implied terms of contract to the extent of the maximum amount of liability allowed under [Miss. Code Ann.] section 11–46–15 (Rev. 2002)); Suddith v. Univ. of S. Miss., 977 So. 2d 1158, 1177 (Miss. Ct. App. 2007) (finding that claims of promissory estoppel, equitable estoppel, and detrimental reliance were governed by the MTCA).[7] Defendants have offered no valid basis for concluding that the MTCA bars either plaintiff's detrimental reliance claim.

---

[7]    Plaintiffs' detrimental reliance claim is in the nature of promissory estoppel, which requires proof of the following: “(1) a representation that later proves to be untrue; (2) an action by the person seeking to invoke the doctrine, such action being undertaken on justifiable reliance of the representation; and (3) a resulting detriment to that person arising from his action.” Suddith v. Univ. of S. Miss., 977 So. 2d 1158, 1180 (Miss. Ct. App. 2007) (internal quotation marks and citation omitted).

<u>Breach of Contract/Wrongful Termination</u>

In their amended complaint, plaintiffs allege, "Mason knew or should have known that he was breaching Matory's contract and that he could not fire Matory because she refused to arrange sexual encounters between Mason and Barnes in violation of Mississippi's public policy against solicitation and/or human trafficking." It is undisputed Matory had no express contract of employment and that her employment was therefore at-will. <u>See</u> <u>Rosamond v. Pennaco Hosiery, Inc., a Div. of Danskin, Inc.</u>, 942 F. Supp. 279, 285 (N.D. Miss. 1996) (under Mississippi law, "[i]n the absence of a contract of employment for a specified term, all employees are deemed to be at-will."). Thus, she could be fired "for a good reason, a wrong reason, or for no reason at all." <u>Kelly v. Miss. Valley Gas Co.</u>, 397 So. 2d 874, 874-75 (Miss. 1981). However, the Mississippi Supreme Court has carved out a narrow public policy exception to the doctrine, holding that "an employee who refuses to participate in an illegal act" or "an employee who is discharged for reporting illegal acts of his employer" may bring an action in tort against the employer. <u>McArn v. Allied Bruce-Terminix Co., Inc.</u>, 626 So. 2d 603, 607 (Miss. 1993). Matory does not allege she was discharged for reporting illegal acts but rather that she was terminated for refusing to participate in an allegedly illegal act.

As <u>McArn</u> recognized, an employee must be protected "from being forced to choose between committing a crime and losing" her job. See <u>Frank v. City of Flowood</u>, 203 So. 3d 786, 792 (Miss. Ct. App.), <u>reh'g denied</u> (Aug. 30, 2016), <u>cert. denied</u>, 204 So. 3d 290 (Miss. 2016). To succeed on a wrongful termination claim under this <u>McArn</u> exception, the actions complained of actually must be criminal in nature. <u>King v. Newton County Bd. of Sup'rs.</u>, 144 Fed. Appx. 381, 385-386 (5th Cir. 2005). The challenged acts must warrant the imposition of criminal penalties, not merely civil penalties. <u>Hammons v. Fleetwood Homes of Miss., Inc.</u>, 907 So. 2d 357, 360 (Miss. App. 2004) (citing <u>Paracelsus Health Care Corp. v. Willard</u>, 754 So. 2d 437, 443 (Miss. 1999)). Here, defendants argued in their summary judgment motion that even if Matory's version of the facts is accepted as true,[8] Mason did not ask Matory to engage in the alleged criminal activity merely by asking her to help facilitate a sexual encounter between him and Barnes. Indeed, the facts claimed by Matory do not support a finding that

---

[8] Defendants have argued that Matory has failed to come forward with evidence tending to show she was terminated for refusing to facilitate a sexual encounter/relationship between Mason and Barnes, and that the evidence of record establishes beyond dispute that she was fired for deficiencies in her job performance and/or for her unprofessional conduct. The court, however, has rejected this position.

she was asked to participate in the crimes of solicitation and/or human trafficking, as she alleges in the complaint.[9]

Fair Labor Standards Act

Matory asserts that from the time she was demoted to crime scene investigator in July 2016 until she was terminated on December 28, 2016, she "worked eight hours every week day and was on call after she left work on all week days and was on call all day on both weekend days," and was not paid for her on-call work, in violation of the Fair Labor Standards Act (FLSA). It is reasonably clear from the complaint that Matory is claiming she was not compensated for time she was on call but not actually working, but it is less clear whether she is also alleging she was not compensated for time she spent responding to calls for her services as a crime scene investigator while she was on call. In this regard, the complaint refers to defendants' failure to

---

[9]   Matory alleges in the complaint that she was asked to participate in the crimes of solicitation and/or human trafficking. Solicitation, which is proscribed by Miss. Code Ann. § 97-29-51, involves payment for sex. As defined in Mississippi Code Annotated § 97-3-54.1(1)(a), a person engages in human trafficking if he/she "coerces, recruits, entices ... or obtains by any means, or attempts to coerce, recruit, entice ... or obtain by any means, another person, intending or knowing that the person will be subjected to forced labor or services...." Neither describes what Matory alleges was asked of her by Mason.
The court notes that in her response, Matory makes no mention of being asked to participate in the crimes of solicitation and/or human trafficking. Instead, she argues that she was terminated for refusing to violate a federal criminal statute, 18 U.S.C. § 241, which addresses conspiracy to violate civil rights. As that was not the claim alleged in the complaint, the court will disregard her argument on this point.

compensate her for her "on-call work," not just her "on-call time."  In her response brief, Matory argues that she was not compensated for her on-call time but also asserts that "pay records show the defendants never paid Matory overtime when she responded to calls.  Although her time records show she worked 13 hours each month, there is no evidence Matory was paid time and a half for the additional hours she worked each week."  In the court's opinion, the reference in the complaint to "on-call work" can reasonably be read to cover both actual work for calls received while on call and to idle time while on call.  Defendants did not move for summary judgment as to the former.[10]  Their motion for summary judgment as to the latter will be granted.

Under the FLSA, "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  Whether an employee's time spent on-call but not performing any active service for her employer is considered working time for FLSA purposes depends on the circumstances.  If the employee, while on call, "'can use the time effectively for his or her own purposes,'" then the time is not compensable.

---

[10]     They did not address Matory's argument in her response regarding the failure to compensate her for overtime hours spent for responding to calls.

35

Bright v. Houston Nw. Med. Ctr. Survivor, Inc., 934 F.2d 671, 676
(5th Cir. 1991) (quoting Halferty v. Pulse Drug Co., 864 F.2d
1185, 1189 (5th Cir. 1989)).  The Fifth Circuit has found an
employee's on-call time is generally not compensable unless the
employee, while on-call, has "'almost no freedom at all.'"  Id.
(quoting Hafferty, 864 F.2d at 1190).  See, e.g., Bright, 934 F.3d
at 676 (employee who "was free to be at his home or at any place
or places he chose, without advising his employer, subject only to
the restrictions that he be reachable by beeper, not be
intoxicated, and be able to arrive at the hospital in
'approximately' twenty minutes," and who "was not only able to
carry on his normal personal activities at his own home, but could
also do normal shopping, eating at restaurants, and the like, as
he chose," was not entitled to compensation while on-call);
Hafferty, 864 F.2d at 1189 (holding that where employee was able
to "visit friends, entertain guests, sleep, watch television, do
laundry, and babysit" while on-call, "she could use the time for
her own purposes and that she [was] not entitled to compensation
for her idle time....."); Brock v. El Paso Natural Gas Co., 826
F.2d 369, 370 (5th Cir. 1987) (concluding that on-call employee
was not entitled to compensation for on-call time where he was
"free to eat, sleep, entertain guests, watch television, or engage
in any other personal recreational activity, alone or with his

family, as long as he [was] within hailing distance of the alarm and the station").

Here, the evidence clearly establishes that Matory's time spent on-call, but not actually performing any services for the Sheriff's Department, may not properly be considered working time and hence is not compensable. Matory does not dispute that she was able to leave the Hinds County Detention Center each day and go home or wherever she chose to engage in whatever activities she desired. She argues, though, that she "had almost no freedom at all" because she was the only crime scene investigator and had no one to relieve her. However, like Matory, the employee at issue in Bright "never had any relief from his on-call status during his nonworking hours", but the Fifth Circuit found this was "wholly irrelevant" to whether his on-call time was compensable. Bright, 934 F.2d at 678.

Conclusion

Based on all of the foregoing, it is ordered that defendants' motion for judgment on the pleadings as to pre-employment claims is granted. It is further ordered that defendants' motions for summary judgment are granted in part and denied in part, as set forth herein.

SO ORDERED this 10th day of December, 2018.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE